STATE OF MINNESOTA

IN SUPREME COURT

A13-0560
A15-0136

Kandiyohi County

Thomas Daniel Rhodes,

        Appellant,

vs.

State of Minnesota,

        Respondent.

Wright, J.
Dissenting, Anderson and Lillehaug, JJ.
Took no part, Hudson, J.

Filed: February 17, 2016
Office of Appellate Courts

————————————

David T. Schultz, Jesse D. Mondry, Maslon LLP, Minneapolis, Minnesota; and

Julie Jonas, Marie Wolf, Innocence Project of Minnesota, Saint Louis Park, Minnesota, for appellant.

Lori Swanson, State Attorney General, Matthew Frank, Assistant Attorney General, Saint Paul, Minnesota; and

Shane Baker, Kandiyohi County Attorney, Willmar, Minnesota, for respondent.

————————————

S Y L L A B U S

The postconviction court did not abuse its discretion by summarily denying appellant's third and fourth petitions for postconviction relief because the petitions are untimely under the postconviction statute of limitations.

Affirmed.

1

O P I N I O N

WRIGHT, Justice.

On July 29, 1998, appellant Thomas Daniel Rhodes was convicted of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2014), and sentenced to mandatory life imprisonment, Minn. Stat. § 609.185(a); *see also* Minn. Stat. § 244.05, subd. 4 (1996). This is our fourth review of this case. *See Rhodes v. State* (*Rhodes III*), 735 N.W.2d 315 (Minn. 2007); *State v. Rhodes* (*Rhodes II*), 657 N.W.2d 823 (Minn. 2003); *State v. Rhodes* (*Rhodes I*), 627 N.W.2d 74 (Minn. 2001). The present appeal arises from the summary denial of Rhodes's third and fourth petitions for postconviction relief. The issue presented in this appeal is whether the postconviction statute of limitations, Minn. Stat. § 590.01, subd. 4(a) (2014), bars these petitions. We hold that the postconviction court did not abuse its discretion by summarily denying relief because Rhodes's petitions for postconviction relief were untimely under the postconviction statute of limitations.

I.

On the night of August 2, 1996, Rhodes and his wife took a boat ride on Green Lake, near Spicer.[1] Rhodes returned to shore and told police that his wife accidentally fell overboard. Approximately 13 hours later, his wife's body was found floating near shore. The cause of her death was drowning. Following a police investigation, Rhodes

---

[1] We limit our discussion of the facts and evidence to those aspects of the case that are directly relevant to this appeal. More detailed descriptions of the underlying facts and evidence are set forth in *Rhodes I*, 627 N.W.2d at 77-81, and *Rhodes II*, 657 N.W.2d at 828-32.

was indicted by a grand jury for first- and second-degree murder. Rhodes pleaded not guilty and demanded a jury trial.

At trial, the State argued that Rhodes forced his wife overboard with a blow to the neck, struck her with the boat multiple times, and subsequently lied to police about the location of her drowning. Dr. Michael McGee, a medical expert for the State, testified in relevant part that the victim "received some type of trauma to the outer surface of the skin in the neck area . . . with enough force to cause breakage of blood vessels." When asked if that external neck trauma could "have been done with a hand, in particular a hand used . . . in the V position," Dr. McGee replied, "I believe that is possible, yes." He also testified that the injuries on both sides of the victim's face could have been caused by multiple strikes from the hull of a boat. By contrast, defense expert Dr. Lindsey Thomas opined that the injuries to both sides of the victim's face were caused by blood that had drained into her face from a forehead injury.

There was disagreement at trial among the experts regarding the drowning location and, specifically, when the victim's body could have been expected to resurface given the lake conditions. Captain William Chandler testified that, if the victim's body "had sunk in Minnesota lake water approximately 40 feet deep," which was the depth of the drowning location on Green Lake that Rhodes reported to police, it would have taken "three to four weeks" for the victim's body to resurface. Captain Chandler testified that, "starting about 30 feet on down, the bottom temperature of any Minnesota lake year round is about 39 degrees." He explained that this cold temperature slows the decomposition rate of a drowned body, which lengthens the time period for a body to

3

resurface.  Defense expert Dale Morry testified that water temperature varies from lake to lake depending on the depth of the lake, the size of the lake, and the above-surface temperature, but "as a 'rule of thumb' a person who drowned in 40 feet of water would resurface in five to eight days."  The testimony from Captain Chandler and defense expert Morry supported the State's theory that Rhodes lied about the location of the drowning, because the victim's body was found floating near the shore approximately 13 hours after she allegedly fell overboard.

The jury found Rhodes guilty of first- and second-degree murder.  Rhodes filed a direct appeal, which we stayed to allow him time to file a postconviction petition. *Rhodes I*, 627 N.W.2d at 81.  In his first postconviction petition, Rhodes asserted an ineffective-assistance-of-counsel claim, alleging that his trial counsel failed to sufficiently cross-examine Dr. McGee and object to his testimony, and failed to present available medical evidence to counter Dr. McGee's testimony.  Rhodes also asserted a newly-discovered-evidence claim consisting of recent medical articles related to drowning forensics.  Attached to his petition, Rhodes submitted an affidavit from Dr. John Plunket, a forensic pathologist.  Dr. Plunket opined that the internal hemorrhaging in the victim's neck probably occurred "during the process of drowning and the struggle for survival." *Id.* at 82.  The postconviction court denied the petition without holding an evidentiary hearing. *Id.* at 83. Rhodes appealed.  In *Rhodes I*, we consolidated Rhodes's direct and postconviction appeals.  We rejected Rhodes's evidentiary challenges, stayed the consolidated appeal, and remanded to the postconviction court for an evidentiary

4

hearing to determine whether trial counsel's performance was objectively unreasonable. *Id.* at 85-86, 88-89.

Drs. Wright, McGee, Thomas, and Plunket testified at the evidentiary hearing. Dr. Ronald Wright testified that the hemorrhaging in the victim's neck could have been caused by some kind of pressure to the throat but, equally as likely, could have been caused during the drowning process. Dr. McGee reaffirmed his trial testimony. And Drs. Thomas and Plunket testified that based on their review of recent medical articles, they believed the hemorrhaging in the victim's neck that occurred during the drowning process or postmortem was a result of hypostasis or a breaking of rigor mortis. The postconviction court subsequently denied Rhodes's request for postconviction relief, concluding that the trial counsel's performance was not objectively unreasonable and that the alleged newly discovered medical evidence did not warrant a new trial. We then vacated our stay of Rhodes's consolidated appeal. *Rhodes II*, 657 N.W.2d at 839.

In *Rhodes II*, we held that the evidence was sufficient to support Rhodes's conviction. The evidence included witnesses who saw a boat zigzagging and heard yelling from its occupants; inconsistencies in Rhodes's statements; physical evidence that the victim's body could not have sunk at the location marked by Rhodes and resurfaced in 13 hours; the discovery of the victim's body nine-tenths of a mile from that location marked by Rhodes; motive evidence including life insurance proceeds, household debt, and Rhodes's extramarital affair; and medical testimony that the victim's head injuries were consistent with multiple strikes by a boat and her neck injuries were caused by external pressure. *See Rhodes II*, 657 N.W.2d at 829-32, 839-42.

Our decision in *Rhodes II* also affirmed the denial of Rhodes's first postconviction petition. 657 N.W.2d at 846. We held that the performance by Rhodes's trial counsel was not objectively unreasonable. *Id.* at 843. We also concluded that even if the new medical literature offered by Rhodes "present[ed] ground-breaking research," *id.* at 846, it failed to satisfy the fourth prong of the *Rainer* newly-discovered-evidence test, which requires a showing that the newly discovered evidence "will probably produce either an acquittal at a retrial or a result more favorable to the petitioner." *Id.* at 845 (quoting *Race v. State*, 417 N.W.2d 264, 266 (Minn. 1987)); *see Rainer v. State*, 566 N.W.2d 692, 695 (Minn. 1997). On this point, we concluded:

> This allegedly newly available medical evidence does not diminish the circumstantial evidence heard and considered by the jury. There was sufficient evidence *independent of the medical evidence*, including physical and motive evidence, testimony as to Rhodes' conduct, and inconsistencies in Rhodes' statements, to conclude that [the victim's] death was a premeditated homicide. . . . Rhodes has not established . . . that [this evidence] would probably produce an acquittal or a result more favorable to him on retrial.

*Id.* at 846 (emphasis added). Consequently, we held that "the postconviction court did not abuse its discretion in concluding that Rhodes is not entitled to a new trial on the grounds of newly discovered medical evidence." *Id.*

Three years after his direct appeal was final, Rhodes filed his second petition for postconviction relief. This petition alleged in part that he was entitled to a new trial based on newly discovered evidence of lake conditions that purportedly explained why his wife's body was found almost nine-tenths of a mile from where he told searchers that he had last seen her. The postconviction court summarily denied the second petition, and

6

we affirmed its decision. *Rhodes III*, 735 N.W.2d 315, 319 (Minn. 2007). In doing so, we explained that "Rhodes ha[d] not shown that the information about the 'uneven bottom' of the lake was not available to him or his counsel during his trial or that his failure to learn of it before trial was not due to a lack of diligence." *Id.*

In 2007, shortly after we released our decision in *Rhodes III*, the 2-year statute of limitations for Rhodes to petition for postconviction relief expired. *See* Minn. Stat. § 590.01, subd. 4(a) (2014) ("No petition for postconviction relief may be filed more than two years after the later of: (1) the entry of judgment of conviction or sentence if no direct appeal is filed; or (2) an appellate court's disposition of petitioner's direct appeal."); Act of June 2, 2005, ch. 136, art 14, § 13, 2005 Minn. Laws 901, 1098 (providing that if a person's conviction became final before the statute's effective date of August 1, 2005, that person has 2 years from that effective date to file a postconviction petition).[2]

On November 27, 2012, more than 5 years after the limitations period had expired, Rhodes filed his third petition for postconviction relief. This petition alleged newly discovered evidence gathered by a private investigator and submitted to Rhodes 3 years

---

[2]    The Legislature enacted this statute of limitations in response to a dramatic increase in the number of postconviction petitions, many of which involved old claims brought years after a conviction was affirmed on direct appeal. *See* Hearing on H.F. 2630, H. Judiciary Policy & Fin. Comm., 83d Minn. Leg., Mar. 10, 2004 (audio tape). Minnesota's 2-year statute of limitations is twice as long as the 1-year statute of limitations for bringing federal habeas corpus claims. *See* 28 U.S.C. § 2244(d)(1) (2012) ("A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.").

before in a report dated September 29, 2009. The report contained (1) maps of Green Lake and GPS/Sonar data; (2) general descriptions of the effects of carbon monoxide poisoning; (3) witness statements regarding the manner in which Rhodes returned to shore; and (4) witness statements regarding the victim's head injuries. Rhodes received a supplemental one-page report from the private investigator on October 19, 2010. As part of his third petition, Rhodes also alleged that the State committed discovery violations by failing to disclose some of the evidence presented in the private investigator's reports. The postconviction court summarily denied the third petition based on the dates of these reports, concluding that Rhodes's claims were untimely because they "arose" more than 2 years before the petition's filing date of November 27, 2012. *See* Minn. Stat. § 590.01, subd. 4(c). The postconviction court also concluded that the claims in Rhodes's third petition failed on their merits. Rhodes appealed the summary denial of his third petition. We stayed the appeal to allow Rhodes to file yet another postconviction petition.

On March 21, 2014, almost 7 years after the statute of limitations had expired, Rhodes filed his fourth postconviction petition, which alleged two claims that are relevant here.[3] First, Rhodes alleges a newly-discovered-evidence claim, primarily based on scientific literature addressing drowning forensics and reports from experts applying that literature to this case. The scientific literature addresses the causes of injuries and

---

[3] Although Rhodes raised an ineffective-assistance-of-counsel claim in his fourth petition, he failed to address it in his brief to this court. As a result, that issue is forfeited. *Powers v. State*, 688 N.W.2d 559, 560 n.1 (Minn. 2004). Moreover, the same issue was raised and decided in *Rhodes II*, 657 N.W.2d at 843.

8

bodily changes in drowning cases, including neck hemorrhaging, postmortem lividity (gravity-dependent pooling of blood), body buoyancy, travel abrasions (injuries caused by scraping the lake bed or shore), and animal predation.[4] Rhodes relies most heavily on two scientific articles related to neck hemorrhaging, referred to here as Pollanen (2009) and Alexander & Jentzen (2011),[5] which allegedly establish changed scientific knowledge on the causes of neck hemorrhaging in drowning cases. Pollanen (2009) concluded that, when a dead body is angled downwards (a "head down position"), hemorrhagic lividity of the soft tissue of the neck (extravascular rupture and leakage of blood vessels due to gravitational pressure after death) may occur, causing "pseudo bruises" that may lead to "misidentification of violent neck injury." Alexander & Jentzen (2011), a case study of a single drowned body, concluded that hemorrhaging in the anterior neck muscles can be explained by elevated venous pressure and the rupture of congested blood vessels caused by reactions during drowning, such as coughing, gagging,

---

[4]     We address the evidence presented in the fourth petition related to body buoyancy, travel abrasions, and animal predation only to conclude that the postconviction court did not abuse its discretion when it determined that this evidence was either cumulative or *Knaffla*-barred because it was presented at trial, in previous postconviction proceedings, or on Rhodes's direct appeal. *Rhodes II*, 657 N.W.2d at 832-35; *see* Minn. Stat. § 590.01, subd. 4(b)(2) (requiring that newly discovered evidence be "not cumulative to evidence presented at trial"); *Leake v. State*, 737 N.W.2d 531, 535 (Minn. 2007) (providing that if a claim was "raised," "known," or "should have been known" on direct appeal, that claim "will not be considered in a subsequent petition for postconviction relief" (citing *State v. Knaffla*, 309 Minn. 246, 243 N.W.2d 737 (1976))).

[5]     Russell T. Alexander & Jeffrey M. Jentzen, *Neck and Scleral Hemorrhage in Drowning*, 56 J. Forensic Sci. 522 (Mar. 2011) [hereinafter Alexander & Jentzen (2011)]; Michael S. Pollanen, et al., *Hemorrhagic Lividity of the Neck: Controlled Induction of Postmortem Hypostatic Hemorrhages*, 30 Am. J. Forensic Med. & Pathology 322 (Dec. 2009) [hereinafter Pollanen (2009)].

vomiting, and abdominal contractions. According to Dr. Jentzen's affidavit, Alexander & Jentzen (2011) disproved the scientific community's earlier belief that hemorrhages in the anterior neck muscles "do not occur in drowning and should always raise the suspicion of foul play." After reviewing Dr. McGee's autopsy report, Dr. Jentzen opined that "the hemorrhage in [the victim's] neck *could* have occurred during the drowning process or postmortem, as opposed to pre-mortem external pressure." (Emphasis added.)

After reviewing Pollanen (2009), Alexander & Jentzen (2011), and the expert affidavits offered by Rhodes, Dr. McGee signed an affidavit, dated July 2, 2014, stating that he still believed "the opinions and conclusions in the testimony I provided at trial and postconviction evidentiary hearing were correct as related to the death of [the victim]." Dr. McGee asserted that, unlike the hemorrhaging in the victim's neck, the hemorrhaging described in the Alexander & Jentzen study was "confined to the fascial surfaces of the muscle." Moreover, Dr. McGee asserted that Rhodes's experts had looked at each of his "findings in isolation and misinterpreted both the nature and cause of each finding."

Second, Rhodes alleges a false-testimony claim based on a 2006 lake survey report conducted by the Minnesota Department of Natural Resources (DNR). This DNR report allegedly establishes that the State's witness, Captain Chandler, testified incorrectly at trial regarding the temperature of Green Lake on the night of the drowning. According to the DNR report, the temperature of Green Lake in August 1996, at a depth of 40 feet, was 68.9 degrees, whereas Captain Chandler testified that the lake temperature at that depth was 39 degrees. Although the State concedes the lake's higher temperature would have reduced the resurfacing time of the victim's body from 4 weeks to 1 week, it

10

contends that this evidence is immaterial because it would not have impacted the State's theory of the case. At trial, the State argued that Rhodes lied about the location of the drowning because Captain Chandler and defense expert Morry both agreed that, if the drowning had occurred at the location indicated by Rhodes, the victim's body would not have resurfaced 13 hours later. Consequently, the State contends that, even if the resurface time at the location indicated by Rhodes was only 1 week, the victim plainly did not drown at that location because her body resurfaced 13 hours later.

The postconviction court summarily denied the fourth petition, concluding that Rhodes failed to satisfy the newly-discovered-evidence exception to the statute of limitations. Minn. Stat. § 590.01, subd. 4(b)(2) (2014). This exception allows a court to hear an untimely petition for postconviction relief when

> the petitioner alleges the existence of newly discovered evidence, including scientific evidence, that could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition, and the evidence is not cumulative to evidence presented at trial, is not for impeachment purposes, and establishes by a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted.

*Id.* The postconviction court explained that, "even if the Court were to accept as true everything contained within the recent scientific literature cited by [Rhodes] and the opinions offered by [Rhodes's] forensic pathologists," the proffered evidence did "not prove by clear and convincing evidence that [Rhodes] is innocent." Rather, the literature and expert opinions simply support the general proposition that the victim's injuries "*may* have been caused by . . . the natural drowning process." (Emphasis added.)

11

Regarding the DNR report on the water temperature of Green Lake, the postconviction court concluded that Rhodes failed to satisfy the "due diligence" requirement of the newly-discovered-evidence exception, Minn. Stat. § 590.01, subd. 4(b)(2). The court found that, because the DNR report was published in 2006 and the data in the report was publicly available as early as 1997, the report could have been discovered with due diligence before the 2-year statute of limitations expired in 2007. The postconviction court concluded, alternatively, that the water-temperature claim failed on its merits for two reasons. First, the State filed a posttrial affidavit in which Captain Chandler opined that, regardless of whether the water temperature at 40 feet was 39 degrees (several weeks to resurface) or 68.9 degrees (approximately one week to resurface), the victim's body could not have resurfaced within 13 hours if she had drowned at the location marked by Rhodes. Second, defense expert Morry testified at trial that if an individual drowns in 40 feet of water, it would take at least 5 days for the drowned body to resurface. The postconviction court concluded, therefore, that even if Captain Chandler had not testified to an incorrect water temperature, the outcome of the trial would have been the same because the jury would have heard testimony from both the State and the defense that the minimum resurfacing time at 40 feet is at least 5 days, which is far longer than the actual 13-hour resurfacing time of the victim.

Rhodes appealed the denial of his fourth postconviction petition. We vacated our stay of the appeal of his third postconviction petition, and this consolidated appeal followed.

## II.

We review a denial of a petition for postconviction relief, as well as the denial of an evidentiary hearing, for an abuse of discretion. *Riley v. State*, 819 N.W.2d 162, 167 (Minn. 2012). A postconviction court does not abuse its discretion unless it has "exercised its discretion in an arbitrary or capricious manner, based its ruling on an erroneous view of the law, or made clearly erroneous factual findings." *Brown v. State*, 863 N.W.2d 781, 786 (Minn. 2015). We review the postconviction court's legal conclusions de novo and its findings of fact for clear error. *Greer v. State*, 836 N.W.2d 520, 522 (Minn. 2013).

An evidentiary hearing on a petition is required when there are material facts in dispute that were not resolved at trial and must be resolved to rule on the merits of the issues raised. *Riley*, 819 N.W.2d at 167. The legal standard required to obtain an evidentiary hearing "is lower than that required for a new trial." *Bobo v. State*, 820 N.W.2d 511, 516 (Minn. 2012). Any doubts about whether to conduct an evidentiary hearing are resolved in favor of the petitioner. *Id.* But a postconviction evidentiary hearing is not required when the petitioner alleges facts that, if true, are legally insufficient to grant the requested relief. *Id.*; *see also* Minn. Stat. § 590.04, subd. 1 (directing a court to hold an evidentiary hearing "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief"). Accordingly, a postconviction court may summarily deny an untimely claim. Minn. Stat. § 590.01, subd. 4 (2014); *Colbert v. State*, 870 N.W.2d 616, 622 (Minn. 2015).

### III.

We first address Rhodes's third postconviction petition. Here, we consider whether the postconviction court abused its discretion by determining that the third petition was untimely under Minn. Stat. § 590.01, subd. 4. Although there are five exceptions to the statute of limitations, Minn. Stat. § 590.01, subd. 4(b), a petitioner has a limited period of time in which to invoke these exceptions. "Any petition invoking an exception . . . must be filed within two years of *the date the claim arises*." *Id.*, subd. 4(c) (emphasis added). A claim arises under subdivision 4(c) when "the petitioner knew or should have known that he had a claim." *Sanchez v. State*, 816 N.W.2d 550, 560 (Minn. 2012). When a petition for postconviction relief is filed more than 2 years after the claim arose under subdivision 4(c), a postconviction court does not abuse its discretion when it summarily denies the petition. *Greer*, 836 N.W.2d at 523; *Wayne v. State*, 832 N.W.2d 831, 834 (Minn. 2013); *McDonough v. State*, 827 N.W.2d 423, 427 (Minn. 2013); *Colbert*, 811 N.W.2d at 105-06.

Rhodes filed his third petition for postconviction relief on November 27, 2012. His claim under the newly-discovered-evidence exception, Minn. Stat. § 590.01, subd. 4(b), was based on two reports, dated September 29, 2009 and October 19, 2010, respectively, which Rhodes received from a private investigator. The dates of the reports conclusively establish that Rhodes "knew or should have known" of the claims raised in his third petition more than 2 years before he filed his third postconviction petition. *See Sanchez*, 816 N.W.2d at 560. The postconviction court, therefore, did not abuse its

discretion by determining that Rhodes's third petition was untimely under subdivision 4(c).

IV.

Turning to Rhodes's fourth postconviction petition, the issue presented is whether the postconviction court abused its discretion when it determined that this petition was untimely under the postconviction statute of limitations.

It is undisputed that Rhodes filed his fourth postconviction petition nearly 7 years *after* the expiration of the postconviction statute of limitations.[6] Consequently, he is not entitled to relief unless he can establish one of the five exceptions set forth in Minn. Stat. § 590.01, subd. 4(b). Rhodes relies exclusively on the newly-discovered-evidence exception.[7] To establish that this exception applies, Rhodes must allege

> newly discovered evidence, including scientific evidence, that could not have been ascertained by the exercise of due diligence by petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition, and the evidence is not cumulative to evidence presented at trial, is not for impeachment purposes, and *establishes by a clear and convincing standard that the petitioner is innocent* of the offense or offenses for which the petitioner was convicted.

---

[6] Because Rhodes's conviction became final before August 1, 2005, the effective date of the statute of limitations, Rhodes had two years after that effective date to file a postconviction petition. Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1098. Rhodes filed his fourth petition on March 21, 2014.

[7] Rhodes's petition also raised the "interests of justice" exception, Minn. Stat. § 590.01, subd. 4(b)(5), but this issue is forfeited because it was not argued in Rhodes's brief to this court. *Wayne v. State*, 860 N.W.2d 702, 704 & n.2 (Minn. 2015).

15

Minn. Stat. § 590.01, subd. 4(b)(2) (emphasis added). The clear-and-convincing-innocence requirement in subdivision 4(b)(2) is more stringent than the newly-discovered-evidence test that applies to timely petitions, which we applied in rejecting Rhodes's similar claim of newly discovered medical evidence in *Rhodes II*, 657 N.W.2d at 845-46. The innocence prong that we apply here requires more than mere "uncertainty" about a petitioner's guilt. *Brown v. State*, 863 N.W.2d 781, 787 (Minn. 2015). Under the clear and convincing standard, the proffered evidence must be unequivocal, intrinsically probable, and free from frailties. *Gassler v. State*, 787 N.W.2d 575, 583 (Minn. 2010).

We conclude that, even if the scientific evidence alleged in Rhodes's fourth petition were proven to be true at an evidentiary hearing, it would not satisfy the innocence prong of the newly-discovered-evidence exception.[8] This is because the scientific evidence does not establish "by a clear and convincing standard that [Rhodes] is innocent."[9] Minn. Stat. § 590.01, subd. 4(b)(2). Rhodes's fourth petition relies heavily

---

[8] Although our analysis focuses on Rhodes's failure to satisfy the innocence prong, we observe that the affidavits of Rhodes's experts are being offered to impeach Dr. McGee's trial testimony. To satisfy the newly-discovered-evidence exception, however, the new evidence must not be offered "for impeachment purposes." Minn. Stat. § 590.01, subd. 4(b)(2). Moreover, we have held that "generally, expert testimony does not constitute newly discovered evidence justifying a new trial" because "if discovery of a tenth expert is new evidence warranting a new trial, no verdict would ever be final." *State v. Blasus*, 445 N.W.2d 535, 543 (Minn. 1989).

[9] Rhodes also argues that the publication date of the scientific literature is not the date his claim "arises" under Minn. Stat. § 590.01, subd. 4(c), because, he contends, for "shifted science," the publication date of an article does not determine the date on which science changed. This is so, he maintains, because scientific knowledge evolves

(Footnote continued on next page.)

on Pollanen (2009) and Alexander & Jentzen (2011), which he alleges establish changed scientific knowledge on the causes of neck hemorrhaging in drowning cases since he was convicted. Pollanen (2009) concluded that, in cases in which a dead body rests in a downward angle, or a "head down position," hemorrhagic lividity of the soft tissue of the neck may cause "pseudo bruises" that result in a "misidentification of violent neck injury." Alexander & Jentzen (2011) concluded that hemorrhaging in the anterior neck muscles can be explained by elevated venous pressure caused by drowning-related bodily reactions. According to Dr. Jentzen's affidavit, Alexander & Jentzen (2011) disproved the scientific community's earlier belief that hemorrhages in the anterior neck muscles "do not occur in drowning and should always raise the suspicion of foul play."

This scientific evidence, however, does not establish that Dr. McGee's trial testimony was incorrect. Dr. McGee did not testify that neck hemorrhages never occur naturally during the drowning process. Rather, he testified that he believed the victim "received some type of trauma to the outer surface of the skin in the neck area . . . with enough force to cause breakage of blood vessels." When asked whether that external neck trauma could "have been done with a hand, in particular a hand used . . . in the V position," Dr. McGee replied, "I believe that is possible, yes." After reviewing Dr.

_____

(Footnote continued from previous page.)
"gradually" through multiple experts and articles in the community. With this argument, Rhodes invites us to adopt a novel "shifted science" rule, in which the accrual date under subdivision 4(c) depends on the date that new scientific knowledge becomes generally accepted. We decline to address the merits of this proposed "shifted science" rule because, even if subdivision 4(c) were satisfied, Rhodes's petition still would be legally insufficient to meet the innocence requirement under Minn. Stat. § 590.01, subd. 4(b)(2).

17

McGee's autopsy report, Dr. Jentzen did not opine that the victim's neck injuries *were caused* by the drowning process. Instead, he opined that "the hemorrhage in [the victim's] neck *could* have occurred during the drowning process or postmortem, as opposed to pre-mortem external pressure." (Emphasis added.) The opinion of another expert hired by Rhodes to support his petition, Dr. Rao, included similar equivocation. She stated: "Recent scientific literature supports my conclusion that the hemorrhages in [the victim's] neck *could be* attributable to something other than external pressure."[10] (Emphasis added.) Thus, even if this scientific theory were proven at a hearing, it would not establish by clear and convincing evidence that Rhodes is innocent. Put differently, that the victim's internal neck hemorrhages "could" have been caused by natural drowning processes does not unequivocally establish that Rhodes did not kill his wife. The alleged scientific evidence is thus legally insufficient to entitle Rhodes to relief under

---

[10]    Other experts hired by Rhodes were somewhat less equivocal in their application of this science (Alexander & Jentzen 2011; Pollanen 2009) to the victim's neck hemorrhages. Dr. Bruce Hyma stated that neck hemorrhages "can occur" during the drowning process and that "[t]he hemorrhages in the neck do not appear to have been caused by external pressure." Dr. Carl Wigren stated that the victim's neck hemorrhages were "likely explained" by the processes proposed by Alexander & Jentzen (2011) and Pollanen (2009) and that the type of hemorrhage in the victim's neck is "not associated with blunt force injury." Even if we consider these opinions as true, and if we assume that they are not merely impeaching of Dr. McGee's trial testimony, *see* Minn. Stat. § 590.01, subd. 4(b)(2), they still would not alter our conclusion that Rhodes cannot establish the innocence prong because there is sufficient nonscientific evidence supporting Rhodes's guilt, *see Rhodes II*, 657 N.W.2d at 846, as discussed below.

the newly-discovered-evidence exception.[11] The innocence prong of subdivision 4(b)(2) requires "more than uncertainty" about Rhodes's guilt. *Brown*, 863 N.W.2d at 787.

Finally, even if we assume that the alleged scientific evidence fully refutes Dr. McGee's medical testimony, that assumption is legally insufficient to establish the innocence prong because, as we held in *Rhodes II*, Rhodes's murder conviction is independently supported by nonmedical (i.e., nonscientific) evidence. 657 N.W.2d at 846. In *Rhodes II*, we assumed that the newly discovered medical evidence was "based on ground-breaking research." *Id.* And we held that, even under the less stringent *Rainer* test, Rhodes was not entitled to relief based on the newly discovered medical evidence, including literature on "hemorrhage in the neck and other postmortem changes in drowning cases" because "sufficient evidence *independent of the medical evidence*" supported Rhodes's conviction. *Id.* (emphasis added). The nonmedical evidence included "physical and motive evidence, testimony as to Rhodes' conduct, and inconsistencies in Rhodes' statements." *Id.* Our legal determinations in *Rhodes II* apply

---

[11]    This is true even under the legal standard articulated by the dissent, which simply requires a defendant to prove by clear and convincing evidence that "no reasonable jury would have found proof of guilt beyond a reasonable doubt." *Infra* at D.2. That the victim's neck hemorrhages "could" have been caused by natural drowning processes does not preclude a reasonable jury from considering the totality of the evidence presented and finding proof of guilt beyond a reasonable doubt. Unlike the dissent's hypothetical DNA evidence, *infra* at D-10, the fact that the victim's internal neck hemorrhages "could" have been caused by the natural drowning process does not meet the dissent's hypothetical "99.99% probability" that Rhodes did not kill his wife.

with equal force here.[12]  Even if Rhodes presented groundbreaking scientific conclusions on the causes of the victim's neck injuries, and even if Dr. McGee's testimony were erroneous under present science, this could not overcome our legal determination in *Rhodes II* that Rhodes's conviction was independently supported by nonscientific evidence.  *Cf. Gassler v. State*, 787 N.W.2d 575, 583 (Minn. 2010) (holding that despite the admission of unreliable ballistics science, the petitioner was not entitled to relief because other evidence supported his conviction).  Because the evidence proffered by Rhodes, even if true, conclusively fails to establish the innocence prong under Minn. Stat. § 590.01, subd. 4(b)(2), the postconviction court did not abuse its discretion by summarily denying Rhodes's claim of newly discovered scientific evidence.

The dissent contends that the factual dispute between Dr. McGee and Rhodes's experts is "material," and therefore an evidentiary hearing is required.  To support this contention, the dissent relies on the fact that, at Rhodes's postconviction hearing in 2001, one expert opined that Dr. McGee's medical testimony was "the most paramount of the entire trial."  *Infra* at D-4 n.2.  However, we rejected implicitly any assertion that Dr.

---

[12]  The dissent contends that we must reassess the nonmedical evidence because Rhodes has offered purportedly new and compelling scientific evidence.  *Infra* at D-11.  We disagree.  There has been no change in the nonmedical facts, including the fact that the victim could not have drowned at the location identified by Rhodes because her body resurfaced 13 hours later.  In *Rhodes II*, we removed Dr. McGee's testimony from the analytical equation and still concluded that there was sufficient evidence to find that the victim's death was a premeditated homicide.  Even if we assume that there are now more compelling reasons to remove Dr. McGee's testimony from the equation, that does not change *Rhodes II*'s conclusion that the nonmedical facts independently support the jury's finding that the victim's death was a premeditated homicide.

McGee's testimony was "paramount to the entire trial" in *Rhodes II*, when we held that *independent* of Dr. McGee's medical testimony, the nonmedical evidence supports the jury's finding that the victim's death was a premeditated homicide. 657 N.W.2d at 846. The dissent's attempt to rewrite *Rhodes II* is unavailing. This is especially so when, as here, the dissent relies on the opinion of a defense expert that predates our decision in *Rhodes II*. Despite the dissent's assertion to the contrary, any factual dispute between Dr. McGee's testimony and the scientific literature and expert opinions proffered in support of Rhodes's fourth petition is not "material." This is because, as we held in *Rhodes II*, a reasonable jury could rely solely on the nonmedical evidence and find beyond a reasonable doubt that Rhodes committed a premeditated homicide.[13]

Apart from scientific literature, Rhodes also presents a Minnesota DNR report that establishes that the temperature of Green Lake in August 1996, at a depth of 40 feet, was about 68.9 degrees Fahrenheit, rather than 39 degrees as Captain Chandler testified. The postconviction court concluded that the production of the DNR report failed to satisfy the "due diligence" requirement of the newly-discovered-evidence exception, Minn. Stat.

---

[13] The dissent also contends that a remand for an evidentiary hearing is required because the postconviction court applied the wrong legal standard for granting an evidentiary hearing. *Infra* at D-7. In its order, the postconviction court stated, "In light of the contradicting testimony presented by equally qualified forensic pathologists, the Court cannot conclude that the scientific literature and expert opinions offered by [Rhodes] (even if true) make it highly probable that [Rhodes] is innocent." This statement, the dissent contends, demonstrates that the postconviction court failed to consider the facts alleged in the petition in a light most favorable to the petition. *Riley*, 819 N.W.2d at 167. However, a remand for an evidentiary hearing is not warranted. As we conclude above, any factual dispute between Dr. McGee and Rhodes's experts is not "material" because, as we held in *Rhodes II*, 657 N.W.2d at 846, a reasonable jury could find Rhodes guilty of premeditated homicide based solely on the nonmedical evidence.

21

§ 590.01, subd. 4(b)(2). The postconviction court determined that this report, which included data available as early as 1997, could have been discovered with due diligence before the 2-year postconviction statute of limitations expired in 2007, because the report was published in 2006. The postconviction court alternatively concluded that the water-temperature claim failed on its merits because the victim's body would not have resurfaced within 13 hours, even if the water temperature was 68.9 degrees at a depth of 40 feet.

Because the DNR report is legally insufficient to establish the innocence prong of Minn. Stat. § 590.01, subd. 4(b)(2), we need not decide whether the due diligence requirement is satisfied. Even if Captain Chandler had provided incorrect testimony on water temperatures and a 3-to-4 week resurfacing time, the jury still heard defense expert Morry's testimony that a drowned body at a 40-foot depth takes at least 5 days to resurface. Moreover, Captain Chandler filed a posttrial affidavit stating that, even in light of the 68.9-degree temperature from the DNR report, it "still would have taken approximately one week for [the victim's] body to refloat" from a 40-foot depth. Rhodes has not offered any evidence that defense expert Morry has changed his opinion on a 5-day minimum resurfacing period based on the warmer temperatures included in the DNR report. Therefore, even if an evidentiary hearing were held, the State's theory that Rhodes lied about the drowning location—that he saw the victim fall overboard at a 40-foot depth—would remain unaffected because there is no evidence that a 13-hour resurfacing time is possible from that depth, regardless of the water temperature. In sum, Rhodes has not raised a material factual dispute that would establish his innocence under

22

a clear and convincing standard. Accordingly, the DNR report is legally insufficient to entitle Rhodes to postconviction relief or an evidentiary hearing.

V.

The record conclusively establishes that Rhodes knew or should have known of the claims raised in his third postconviction petition before November 27, 2010 (2 years before he filed his third postconviction petition). Therefore, his third petition is untimely under the 2-year statute of limitations provided by Minn. Stat. § 590.01, subd. 4(c). Also, even if the alleged evidence in support of his fourth postconviction petition were proven to be true at an evidentiary hearing, this evidence would fail to establish by a clear and convincing standard that Rhodes is innocent. Therefore, his fourth petition is untimely under the newly-discovered-evidence exception, Minn. Stat. § 590.01, subd. 4(b)(2). Accordingly, we affirm the postconviction court's denial of Rhodes's third and fourth petitions as untimely under the postconviction statute of limitations.

Affirmed.


HUDSON, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

ANDERSON, Justice (dissenting).

I join in Part III of the court's opinion, which affirms the postconviction court's summary denial of Rhodes's third petition for postconviction relief. But I disagree with the court's decision in Part IV, which affirms the summary denial of Rhodes's fourth petition. The postconviction court abused its discretion by summarily denying the fourth petition because this petition raises material fact questions, in an entirely circumstantial case, that must be resolved at an evidentiary hearing. Contrary to the court's conclusion, Rhodes's fourth petition is legally sufficient to establish the "innocence" prong to overcome the 2-year statute of limitations, Minn. Stat. § 590.01, subd. 4(b)(2) (2014). More specifically, Rhodes has alleged the existence of evidence that, if true and considered in the light most favorable to the petition, would establish by a clear and convincing standard that no reasonable jury would have convicted Rhodes had the newly discovered evidence been presented at trial. Therefore, I would remand for an evidentiary hearing. I respectfully dissent.

## I.

Under the postconviction statute, Minn. Stat. § 590.04, subd. 1 (2014), a postconviction court "shall" promptly grant an evidentiary hearing on a petition for postconviction relief unless "the petition and the files and records of the proceeding *conclusively show* that the petitioner is entitled to no relief." (Emphasis added.) To determine whether an evidentiary hearing is required, the postconviction court must assume the facts alleged in the petition to be true, *Bobo v. State*, 820 N.W.2d 511, 516

D-1

(Minn. 2012), and consider those facts in the light most favorable to the petition, *Riley v. State*, 819 N.W.2d 162, 167 (Minn. 2012). The postconviction court "must grant the evidentiary hearing whenever material facts are in dispute." *Wilson v. State*, 726 N.W.2d 103, 107 (Minn. 2007). "*Any doubts* about whether to conduct an evidentiary hearing should be resolved in favor of [the petitioner]." *Bobo*, 820 N.W.2d at 516 (emphasis added). And an evidentiary hearing is "*particularly important* when the petition 'attacks' important evidence in a circumstantial case." *Wilson*, 726 N.W.2d at 107 (emphasis added) (citing *Opsahl v. State*, 677 N.W.2d 414, 423 (Minn. 2004)). This is a wholly circumstantial case. *State v. Rhodes* (*Rhodes II*), 657 N.W.2d 823, 827 (2003) (stating that "the evidence in this case is wholly circumstantial").

The court holds that Rhodes's fourth petition fails to establish the "innocence" prong under the newly-discovered-evidence exception to the postconviction statute of limitations. Minn. Stat. § 590.01, subd. 4(b)(2). The innocence prong requires Rhodes to allege the existence of evidence that, if true, would establish by a clear and convincing standard that Rhodes is innocent. *See id.*; *Miles v. State*, 800 N.W.2d 778, 783 (Minn. 2011). But the court does not discuss our recent precedent on the meaning and application of this innocence prong. Contrary to the approach suggested by the court, the word "innocent" in this statute requires neither a complete contradiction of incriminating evidence at trial nor a showing that the petitioner certainly or "unequivocally" did not commit the crime for which he was convicted. This approach is not supported by precedent and, moreover, it would be impossible to meet such a standard in a circumstantial case. Rather, our precedent indicates that this innocence prong refers to

D-2

the "actual innocence" rule, which is established when no reasonable jury would have found proof of guilt beyond a reasonable doubt. *See Brown v. State*, 863 N.W.2d 781, 787-88 (Minn. 2015); *Riley*, 819 N.W.2d at 170.[1] More specifically, to satisfy the innocence prong under Minn. Stat. § 590.01, subd. 4(b)(2), Rhodes must have alleged the existence of newly discovered evidence that, if true and considered in the light most favorable to the petition, would establish by a clear and convincing standard that no reasonable jury would have found Rhodes guilty of his wife's murder beyond a reasonable doubt, had that newly discovered evidence been presented at trial. In addition, because any newly-discovered-evidence claim necessarily involves new evidence the jury did not have before it, the postconviction court should assess how a reasonable jury would react to the overall, newly supplemented record, which requires a judgment about the evidence as a whole and its likely effect on reasonable jurors in applying the reasonable-doubt standard.

## II.

At Rhodes's trial, Dr. Michael McGee, a medical expert for the State, testified in relevant part that Rhodes's wife, Jane, "received some type of trauma to the outer surface of the skin in the neck area . . . with enough force to cause breakage of blood vessels."

---

[1] The "actual innocence" rule from *Brown*, 863 N.W.2d at 787-88, and *Riley*, 819 N.W.2d at 170, uses the language "no reasonable jury would convict," but it is helpful to unpack the word "convict" and place it within the well-established standard for conviction, "proof beyond a reasonable doubt." *E.g.*, *State v. Peterson*, 673 N.W.2d 482, 486 (Minn. 2004) ("[T]he Due Process Clause requires the state to prove every element of a charged offense beyond a reasonable doubt." (citing *In re Winship*, 397 U.S. 358, 364 (1970)).

When asked if that external neck trauma could "have been done with a hand, in particular a hand used . . . in the V position?" Dr. McGee replied, "I believe that is possible, yes." Based on this testimony, the State argued at trial that "[Rhodes] knock[ed] his wife out of the boat with a blow to the neck." In my view of the State's entirely circumstantial case, this testimony by Dr. McGee—that Jane's neck hemorrhaging was caused by external force—was the most critically incriminating evidence of the entire trial.[2]

In his fourth postconviction petition, Rhodes presents scientific evidence that allegedly refutes Dr. McGee's conclusions regarding the cause of Jane's neck hemorrhaging. This evidence includes recent scientific literature on the causes of neck hemorrhaging, and reports from seven forensic experts hired by the Minnesota Innocence Project in 2012 and 2013, who examined Jane's autopsy and the evidence from Rhodes's trial. Rhodes's experts include several chief medical examiners, professors of pathology at prominent universities, and reputable forensic pathologists. In the context of Jane's neck hemorrhaging, Rhodes's petition and his expert reports rely most heavily on two scientific articles, referred to as Alexander & Jentzen (2011) and Pollanen (2009).

Alexander & Jentzen (2011) advances new scientific knowledge regarding hemorrhaging in certain neck muscles caused by drowning, which allegedly refutes previously accepted scientific knowledge that hemorrhaging in such muscles "do[es] not occur in drowning and should always raise the suspicion of foul play." According to Dr.

---

[2]     At Rhodes's postconviction hearing in 2001, one expert opined that Dr. McGee's medical testimony was "the most paramount of the entire trial" and the question on the hand in the "V" position was "the murder question. That's the question: Did he kill her?"

Jentzen, this article established that this previous knowledge was "erroneous" because such neck hemorrhaging can be explained by elevated venous pressure and rupture of congested blood vessels, caused by drowning reactions such as coughing, gagging, vomiting, and abdominal contractions.

The Pollanen (2009) article proposed that, when a dead body is angled downward (a "head down position," which commonly occurs for drowned bodies), hemorrhagic lividity of the soft tissue of the neck (extravascular rupture and leakage of blood vessels due to gravitational pressure after death), causes "pseudo bruises" in the neck that may lead to "misidentification of violent neck injury."

After analyzing the evidence in Rhodes's trial and applying the relevant scientific literature, Rhodes's forensic experts concluded that "[Dr. McGee] misinterpreted postmortem artifacts as antemortem injuries"; "I do not believe there is evidence of [premortem] trauma—consistent with the story [that Jane] accidently fell overboard and drowned"; "the hemorrhages in [Jane's] neck were postmortem"; "I would not consider this death a homicide"; and the death "should have been classified as an accident." More specifically, based on the application of science from Alexander & Jentzen (2011) and Pollanen (2009), Dr. Hyma opined that "[t]he hemorrhages in the neck *do not appear to have been caused by external pressure*." (Emphasis added.) Dr. Wigren concluded that Jane's neck hemorrhages are "*likely explained*" by the natural, internal processes proposed by Alexander & Jentzen (2011) and Pollanen (2009); that the type of hemorrhaging in Jane's neck is "*not associated with blunt force injury*"; and that the hemorrhages were "*not consistent* with blunt force injury to the neck." (Emphasis

added.)  The opinions of Rhodes's experts as a whole, and in particular the conclusions by Dr. Hyma and Dr. Wigren, completely contradict Dr. McGee's critical trial testimony that Jane's neck hemorrhages were caused by external trauma "to the outer surface of the skin in the neck area . . . with enough force to cause breakage of blood vessels."[3]

The court selectively emphasizes that two of Rhodes's experts, Drs. Jentzen and Rao, used equivocal language in parts of their reports. They stated that "the hemorrhage in [Jane's] neck *could* have occurred during the drowning process or postmortem, as opposed to pre-mortem external pressure"; and the "hemorrhages in [Jane's] neck *could* be attributable to something other than external pressure."  (Emphasis added.)  But any concern about equivocation, from two of seven of the forensic experts, goes to the *weight* of the evidence alleged, which must be evaluated at an evidentiary hearing where these experts and the state's experts would be allowed to testify, to be cross-examined, and to further explain their conclusions.  At this stage, the only question is whether Rhodes alleged the existence of evidence that is *legally sufficient* to warrant relief, which requires the postconviction court to consider the evidence as true, *in the light most favorable* to Rhodes, with any doubts resolved in his favor.  Under this "light most favorable" standard, the only fair assessment of Rhodes's petition as a whole, including all seven of

---

[3]     Rhodes's experts are not offered merely to "impeach" Dr. McGee, as the court states.  Rhodes's experts are not merely taking a second look at the same trial record, disagreeing with Dr. McGee, and reaching different conclusions, which would be impeachment prohibited by Minn. Stat. § 590.01, subd. 4(b)(2).  Rather, here Rhodes's forensic experts are offered to *explain* and *apply* newly discovered scientific *evidence*, from Alexander & Jentzen (2011) and Pollanen (2009), to a newly supplemented record. It is the application of that scientific *evidence*, and not merely hindsight disagreements by new experts, which shows that Dr. McGee's conclusions are scientifically erroneous.

the expert reports and the scientific literature, is that Dr. McGee's testimony about external neck trauma was erroneous, and that Jane's neck hemorrhages were caused by natural drowning processes. Moreover, even if I assumed that there was not a "complete" contradiction of Dr. McGee's testimony, such a complete contradiction is *not* required to warrant an evidentiary hearing. At the very least, Rhodes's fourth petition presents a dispute of material fact, which must be resolved at an evidentiary hearing. *Wilson v. State*, 726 N.W.2d 103, 107-08 (Minn. 2007).

In the postconviction court's summary denial of Rhodes's fourth petition, it erroneously reached the following conclusion: "In light of the *contradicting testimony* presented by *equally qualified* forensic pathologists, the Court cannot conclude that the scientific literature and expert opinions offered by [Rhodes] (even if true) make it highly probable that [Rhodes] is innocent." (Emphasis added.) This conclusion by the district court, made "in light of contradicting testimony" by "equally qualified forensic pathologists" (referring to Rhodes's experts and the State's expert Dr. McGee), is an abuse of discretion. This is an erroneous application of the standard for granting an evidentiary hearing, which requires the facts alleged in the petition to be considered as true and in the light most favorable to the petition. By *weighing* the "contradicting" and "equally qualified" testimony by Dr. McGee, the postconviction court failed to properly apply this standard. And it did what can be done only *after* an evidentiary hearing. Whether Dr. McGee's opinions are "equally qualified," compared with the forensic experts offered by Rhodes, is a question of credibility and evidentiary weight, which can be considered and resolved only by live testimony at an evidentiary hearing—not on a

summary denial. Even more importantly, the fact that the postconviction court apparently determined that Rhodes's experts and literature were *"contradict[ed]"* by Dr. McGee's testimony is actually a basis for *requiring* an evidentiary hearing, not denying one, because the contradiction presents a dispute of material fact. *See Riley*, 819 N.W.2d at 167; *Wilson*, 726 N.W.2d at 107-08.

The scientific evidence presented by Rhodes, when considered as true and in the light most favorable to the petition, alleges important issues of material fact regarding Rhodes's newly-discovered-evidence claim, which must be resolved at an evidentiary hearing. Even if we determine that Rhodes is *not* entitled to a new trial on the record before us, an evidentiary hearing must be held if issues of material fact remain. *See Wilson*, 726 N.W.2d at 106-08. In *Wilson*, a postconviction petitioner presented an affidavit of a forensic expert, who questioned the scientific methods and testimony of a State witness related to ballistics tests. *Id.* at 105-06. Although we held that, on the record before us, the petitioner was "not entitled to a new trial," we remanded for an evidentiary hearing because the petitioner "raised *important issues of material fact* by submitting [the forensic expert affidavit, which] *raise[d] serious questions about the scientific methods* used . . . and *the opinion testimony* by the [police officer]." *Id.* at 106-07 (emphasis added). We concluded that an evidentiary hearing was required because the forensic expert's affidavit, "if true, indicates that the officer's testimony may have been inaccurate or even unfounded." *Id.* at 108.

Similarly here, according to the literature and expert reports presented by Rhodes's fourth petition, regarding changes in scientific knowledge on drowning-related

internal neck hemorrhaging, Dr. McGee's testimony at trial that Jane's neck hemorrhages were caused by external force may be "inaccurate or even unfounded" under today's science. Indeed, under the "light most favorable" standard, we *must* assume that it is inaccurate based on the contradictions presented by Rhodes's scientific evidence. Because Rhodes's fourth petition, considered in the light most favorable to Rhodes, raises "important issues of material fact" and "serious questions" about the opinion testimony of Dr. McGee, an evidentiary hearing is required, *Wilson*, 726 N.W.2d at 106-08, which is "particularly important" here because Rhodes's fourth petition "attacks" the most critical evidence in the State's wholly circumstantial case, *id.* at 107 (citing *Opsahl*, 677 N.W.2d at 423); *see Rhodes II*, 657 N.W.2d at 827 (stating that "the evidence in this case is wholly circumstantial").[4]

In the alternative, the court concludes that, "even if we assume that the alleged scientific evidence fully refutes Dr. McGee's medical testimony, that assumption is legally insufficient to establish the innocence prong because, as we held in *Rhodes II*,

---

[4]    The court declines to address the "shifted science" rule proposed by Rhodes for overcoming the 2-year statute of limitations under Minn. Stat. § 590.01, subd. 4(c). Rhodes argues that, in the context of "shifted science," the publication date of a scientific article does not determine the date on which science changed because scientific consensus evolves "gradually" through multiple experts and articles in the community. With this argument, Rhodes impliedly invites us to adopt a novel "shifted science" rule, in which the accrual date under subdivision 4(c) depends not on publication dates, but on the date that new scientific knowledge becomes generally accepted. I would adopt this rule, or some version of it, and remand for an evidentiary hearing to include expert testimony on whether and when the shifted science alleged in Rhodes's fourth petition became "generally accepted" in the relevant scientific community. *See Roby v. State*, 787 N.W.2d 186, 191 & n.3 (Minn. 2010); *see also State v. Tanksley*, 809 N.W.2d 706, 708 n.1 (Minn. 2012).

[657 N.W.2d at 846,] Rhodes's murder conviction is independently supported by nonmedical (i.e., nonscientific) evidence," including "physical and motive evidence, testimony as to Rhodes' conduct, and inconsistencies in Rhodes' statements." The court holds that its conclusions 14 years ago from *Rhodes II* "apply with equal force here."

The problem is that *Rhodes II*'s conclusions do *not* apply equally here for at least two reasons. First and most obviously, at the time that *Rhodes II* was considered and decided (2002-2003), the presently asserted, new scientific knowledge on the causes of drowning-related hemorrhaging (Alexander & Jentzen 2011, Pollanen 2009, and the seven expert reports) did not yet exist. Despite *Rhodes II*'s holding on the sufficiency of the evidence, 657 N.W.2d at 846, the science presented in Rhodes's fourth petition is new, distinct, and much more critically damaging to Dr. McGee's medical testimony compared with the evidence asserted in *Rhodes II*. The evidence in this petition *changes the record* that would have been heard by the jury, and this new supplemented record must be considered as a whole, and not by melding it with our conclusion from 14 years ago based on different, much less advanced scientific evidence related to the causes of Jane's injuries. Our conclusion 14 years ago that the medical evidence asserted in Rhodes's first postconviction petition was insufficient for relief in *Rhodes II* does not necessitate a determination now that the distinct scientific evidence presented *here* is legally insufficient to warrant an evidentiary hearing because nonscientific evidence supported the conviction. The court presents a false dichotomy between scientific evidence and nonscientific evidence, under which *no* scientific evidence of any type would *ever* be sufficient to exonerate Rhodes because in *Rhodes II* we concluded that the

nonscientific evidence was sufficient. This cannot be correct. Imagine, hypothetically, that a defendant's conviction was affirmed on direct appeal because nonscientific evidence was sufficient to support the verdict. Then, in a postconviction proceeding, the defendant presented newly discovered DNA evidence that showed, to a 99.99% probability, that the defendant did not kill the victim. Would this court hold that this DNA evidence is legally insufficient for an evidentiary hearing because it already concluded, under an earlier direct appeal, that certain nonscientific evidence was sufficient to support the conviction? Of course not. The point here is that in a newly-discovered-evidence case, the *newly supplemented record* must be considered anew, as a whole, because the newly alleged evidence may push or pull on the remainder of the evidence at trial (or from previous postconviction proceedings) in new or different ways, such that the newly balanced record would require a reasonable jury to reach a different conclusion. In other words, merely because scientific evidence in a previous proceeding could not outweigh the nonscientific evidence then does not preclude new and distinct scientific evidence from tipping that balance now. As applied here, the nonscientific evidence from Rhodes's trial may no longer be independently sufficient to support his conviction, as held in *Rhodes II*, if it is considered fully within a newly supplemented record and outweighed by distinctly compelling scientific evidence that refutes the most critical evidence offered by the State at trial.

Second, the list of "nonmedical" evidence sufficient for Rhodes's conviction, as described by the *Rhodes II* decision, now has holes that must be addressed and cannot simply be pasted into the current, newly supplemented record. One of the items in the

list, "physical evidence," refers *entirely* to the State's expert testimony from Captain Chandler regarding the expected resurfacing time of a drowned body based on the water temperature and depth at the drowning location. *See Rhodes II*, 657 N.W.2d at 829-30, 840, 843 ("Chandler found it improbable that a body could sink in Green Lake [at the 40-foot-depth location identified by Rhodes], resurface, and then float nine-tenths of a mile in 13 hours, given the lake temperature . . . . [P]hysical evidence proves that, under the circumstances, a body under 40 feet of water would not refloat for three to four weeks . . . . [P]hysical evidence suggests that Jane fell overboard in a different part of the lake.").

But we now know that Captain Chandler testified incorrectly at trial regarding the water temperature at a 40-foot depth and the resulting 3-to-4 week resurfacing time. Although Captain Chandler testified at trial that Green Lake was 39 degrees, we now know that the actual temperature, according to a survey by the Minnesota DNR, was 69 degrees.[5] Thus, the list of "sufficient" nonmedical evidence from *Rhodes II* no longer

_____

[5] The postconviction court concluded that the DNR report was untimely under the "due diligence" requirement of the newly-discovered-evidence exception, Minn. Stat. § 590.01, subd. 4(b)(2), because the DNR report could have been discovered by due diligence before the 2-year statute of limitations expired in 2007. I conclude that Rhodes's submission of this DNR report is not untimely because it is not reasonable to expect a petitioner in Rhodes's circumstances, by due diligence, to discover this DNR data and file a petition for postconviction relief on that basis before 2007. And the evidence here is not a disputed opinion, expert or otherwise, or some other kind of ephemeral evidence where the passage of time or fading memories makes admission problematic; it is temperature data maintained by an official State agency and data that is foundational to expert testimony critical to the State's case.

holds up.  Now, all we are left with is weak evidence of motive;[6] conflicting witness testimony regarding relatively innocuous conduct by Rhodes;[7] observations of a boat on Green Lake;[8] and relatively minor inconsistencies in Rhodes's statements, given three separate times over a 3-month period.[9]  *See Rhodes II*, 657 N.W.2d at 846.  Thus, the

---

[6]    The State argued that Rhodes had a motive to kill Jane because of (1) a nonsexual relationship with another woman that ended 13 months before Jane's death; (2) a one-time consultation with a divorce attorney 15 months before Jane's death; (3) life insurance; and (4) household debt from a home mortgage and loans on a car and a boat.

[7]    For example, on the night of the drowning, one witness saw a man, matching Rhodes's description, drive a boat to shore.  The man "took off running" at "top speed" across the street to the Northern Inn.  But another witness testified that a man, matching Rhodes's description, returned his boat to shore, and "walked" across the street to the Northern Inn.  During the search for Jane, witnesses observed Rhodes's conduct to be consistent with "someone who just lost a loved one"—he was described by various witnesses as "crying," "very upset," "frantic," "very emotional," "wanting to save his wife," "deeply agitated," and "devastated" with "huge sobs."  But one witness testified that although "once in a while [Rhodes would] be emotional and cry," the witness did not "notice any tears."  Another witness said that Rhodes was "not [crying] in my opinion," although that witness "couldn't see [Rhodes's] face" and wasn't "paying much attention."

[8]    For example, seven witnesses testified to seeing or hearing sounds from a boat on Green Lake on the night of Jane's drowning.  Some of these witnesses testified to seeing a boat driving in "nine and eight" patterns with rapid speed and sharp circles.  Five of these witnesses testified to hearing sounds that were not distressful, such as "laughter," "hooting and hollering," "partying it up," and "having fun out there."  One of these seven witnesses heard "moaning sounds" and a woman's voice scream, "Stop. No. It Hurts."  Rhodes told police that, while he and his wife were taking an intimate boat ride, they saw and heard another boat without any lights that was "partying it up" and "tearing around."

[9]    These inconsistencies, collected from statements made by Rhodes on August 3, 1996, August 15, 1996, and October 10, 1996, include the following: (1) that the boat was going "slow" or near "top speed," although police confirmed that the boat's speedometer was not working properly; (2) that Jane fell overboard near the "back," the "side," or the "back side" of the boat; (3) that the boat was headed north or headed toward shore at the time Jane fell overboard; (4) that when Jane fell overboard, Rhodes missed the throttle on the first grab and then turned around the boat, or he "immediately"

(Footnote continued on next page.)

D-13

decision here becomes even more troubling.  In essence, the court is now relying on only *part* of the conclusion from *Rhodes II* on the sufficiency of the nonmedical evidence that was reached *after* an evidentiary hearing; adding that conclusion to a newly supplemented record with distinct scientific evidence that refutes critical state testimony; and concluding that Rhodes's fourth petition is *legally insufficient*, without allowing an evidentiary hearing to actually weigh this newly supplemented record.

The provisions of Chapter 590, and our case law interpreting those provisions, are designed to reduce the burden of meritless postconviction proceedings.  Those provisions are not intended, however, to bar claims that may have merit.   Based on the material factual issues presented by Rhodes's fourth petition, I cannot conclusively say that Rhodes is entitled to no relief.  Minn. Stat. § 590.04, subd. 1; *Wilson*, 726 N.W.2d at 106-08; *see Bobo*, 820 N.W.2d at 516-20.  Here, the newly discovered evidence, if proven to be true, and considered in the light most favorable to Rhodes, would establish by a clear-and-convincing standard that no reasonable jury would have convicted Rhodes of first-degree premeditated murder beyond a reasonable doubt had the newly discovered evidence been presented at trial.  *See* Minn. Stat. § 590.01, subd. 4(b)(2); *Brown*, 863 N.W.2d at 787-88; *Riley*, 819 N.W.2d at 170.  Under our well-established precedent, "any doubt" must be resolved in favor of holding an evidentiary hearing, and holding such a hearing is "particularly important" where newly discovered evidence attacks

(Footnote continued from previous page.)
turned around (without mentioning whether a throttle grab was missed); and (5) that Jane did not scream when she fell overboard, or there "might have been like a muffled scream" or a "cut off scream . . . [but it] would be pure speculation on my part."

important evidence in a wholly circumstantial case like this one. *Bobo*, 820 N.W.2d at 516; *Wilson*, 726 N.W.2d at 107; *Opsahl*, 677 N.W.2d at 423. For these reasons, I would reverse and remand for an evidentiary hearing. I respectfully dissent.


LILLEHAUG, Justice (dissenting).

I join in the dissent of Justice Anderson.